Jennie SANCHEZ, Adeline Sanchez, and Debra Casanova, Plaintiffs,

v.

The STATE OF COLORADO and Natalie Meyer, in her official capacity as Secretary of State for the State of Colorado, Defendants.

Civ. A. No. 93–S–0963.

United States District Court, D. Colorado.

Aug. 31, 1994.

Gale T. Miller, Richard A. Westfall, Anthony F. Medeiros, Davis, Graham & Stubbs, Pamela J. Fair, Shelley Wittevrongel, Law Offices of John McKendree, Denver, CO, for plaintiffs.

Maurice G. Knaizer, Deputy Atty. Gen., Alesia M. McCloud–Chan, Asst. Atty. Gen., General Legal Services Section, Denver, CO, for defendants.

## MEMORANDUM OPINION AND ORDER

SPARR, District Judge.

THIS MATTER came before the court for trial on March 21, 1994 through March 25, 1994. The court heard final argument on June 8, 1994. Having reviewed all of the evidence, the arguments, and the applicable law, and being fully advised in the premises, the court finds and concludes as follows.

The Plaintiffs bring a single claim for relief for violation of § 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973. Plaintiffs allege that District 60 of the Colorado House of Representatives (H.D. 60), as it is currently configured, violates § 2 by unlawfully diluting the voting strength of Hispanic citizens in South Central Colorado. Plaintiffs ask the court to: (1) declare that H.D. 60 violates § 2; (2) grant a permanent injunction preventing any further elections for representative to the Colorado General Assembly from H.D. 60 as it is presently configured; (3) order the adoption of a redistricted H.D. 60 that contains a majority Hispanic voting age population; and (4) award Plaintiffs their fees and costs.

### A. Background

In 1992, pursuant to Colorado's reapportionment process set forth in Article V, § 48 of the Colorado Constitution, the Colorado Reapportionment Commission devised H.D. 60 as presently drawn. H.D. 60 is comprised of Alamosa, Conejos, Costilla, Huerfano, Mineral, Rio Grande, and Saguache counties, plus the portion of Las Animas that is west of Trinidad. All of these counties, except Huerfano and Las Animas, are considered to be in the San Luis Valley (the Valley). Hispanics are estimated to comprise 45.31% of the total population and 42.38% of the voting

age population of H.D. 60. The 1992 redistricting increased the total Hispanic voting age population in H.D. 60 by approximately five percent (5%).

In 1991 and 1992, Colorado's Reapportionment Commission conducted meetings and hearings, heard extensive presentations, and compiled substantial reports regarding the redistricting of South Central Colorado and H.D. 60. (Plaintiffs' Exhibits 9–20, 30, 33, 34, 47, 72, 83, 86, 87, 92, 93; Defendants' Exhibits F1, F2, F3, G, H, I, J, K, L, L1–L6). The testimony at the hearings favored preserving the Valley intact and disapproved splitting the Valley in order to increase the percentage of Hispanic voters. (*See* Plaintiffs' Exhibits 14, 15, 16 and Defendants' Exhibits H, I, J, L4). Testimony at the hearings revealed that Hispanics in the Valley have different political interests than Hispanic voters outside the Valley. There was no suggestion to the Commission that an Hispanic community of interest existed between the Valley, Pueblo, and Trinidad. After extensive consideration, the Commission identified certain specific goals for redistricting the southern central part of the State, among others: (1) preserving the Valley in a single house district; (2) separating the Valley from western slope districts; (3) preserving Pueblo West in a single house district; and (4) preserving Huerfano and Las Animas counties in a house district extending east, not west. (*See* Plaintiffs' Exhibit 17, p. 1.). The plan ultimately adopted by the Reapportionment Commission was upheld by the Colorado Supreme Court, over a challenge to H.D. 60 by two of these same Plaintiffs. *In re Colorado General Assembly*, 828 P.2d 185, 193 (Colo.1992). Plaintiffs now allege that the drawing of the present H.D. 60 violates § 2 of the Voting Rights Act by diluting Hispanic votes in South Central Colorado.

### B. Legal Framework

Because it is the domain of the States, and not the federal courts, to conduct apportionment in the first place, federal courts are barred from intervening in state apportionment in the absence of a violation of federal law. *Voinovich v. Quilter,* —— U.S. ——,

——-——, 113 S.Ct. 1149, 1156–57, 122 L.Ed.2d 500 (1993). "[R]eapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court." *Growe v. Emison,* 507 U.S. ——, ——, 113 S.Ct. 1075, 1081, 122 L.Ed.2d 388 (1993), citing *Chapman v. Meier,* 420 U.S. 1, 27, 95 S.Ct. 751, 766, 42 L.Ed.2d 766 (1975). Because the States do not derive their reapportionment authority from the Voting Rights Act, but rather from independent provisions of state and federal law, the federal courts are bound to respect the States' apportionment choices unless those choices contravene federal requirements. *Voinovich,* —— U.S. at ——, 113 S.Ct. at 1157 (citations omitted).

In 1982, § 2 was amended to eliminate the need to prove discriminatory intent in order to prove a violation of § 2. *Thornburg v. Gingles,* 478 U.S. 30, 43–44, 106 S.Ct. 2752, 2762–2763, 92 L.Ed.2d 25 (1986). Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, provides:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2) [42 USCS § 1973(f)(2) ], as provided in subsection (b).
>
> (b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

Hispanics are members of a class of citizens protected by § 1973(a). 42 U.S.C. § 1973f(2).

Section 2 claims are analyzed under a two-part framework. *Magnolia Bar Ass'n., Inc. v. Lee,* 994 F.2d 1143, 1146 (5th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 555, 126 L.Ed.2d 456 (1993). To prevail on a § 2 claim, the Plaintiffs must first satisfy certain threshold requirements set forth by the Supreme Court in *Gingles,* 478 U.S. at 30, 106 S.Ct. at 2752. *Lee,* 994 F.2d at 1146. Minority voters must then offer evidence of the totality of circumstances to demonstrate whether the challenged election practice "has resulted in the denial or abridgment of the right to vote based on color or race." *Lee,* 994 F.2d at 1146, citing *Chisom v. Roemer,* 501 U.S. 380, 393, 111 S.Ct. 2354, 2363, 115 L.Ed.2d 348 (1991).

A claim of vote dilution in a single member district requires proof meeting the same three threshold conditions for a dilution challenge to a multimember district. *Johnson v. DeGrandy,* —— U.S. ——, ——-——, 114 S.Ct. 2647, 2654–55, 129 L.Ed.2d 775 (1994), citing *Growe,* —— U.S. at ——, 113 S.Ct. at 1084; *Lee,* 994 F.2d at 1146. To satisfy the *Gingles* threshold inquiry, the minority group must prove by a preponderance of the evidence that: (1) it is sufficiently large and geographically compact to constitute a majority in a single member district; (2) it is politically cohesive; and (3) the white majority votes sufficiently as a bloc to enable it, in the absence of special circumstances, usually to defeat the minority group's preferred candidate. *DeGrandy,* —— U.S. at ——-——, 114 S.Ct. at 2654–55 (citations omitted); *Lee,* 994 F.2d at 1146, citing *Gingles,* 478 U.S. at 48–51, 106 S.Ct. at 2765–2767. The three threshold factors are "necessary preconditions" for establishing vote dilution. *DeGrandy,* —— U.S. at ——, 114 S.Ct. at 2657, quoting *Gingles,* 478 U.S. at 50, 106 S.Ct. at 2766. If these *Gingles* threshold factors are not present, then the challenged electoral practice cannot be considered as the cause of the minority's inability to elect its preferred candidate. *Sanchez v. Bond,* 875

F.2d 1488, 1492 (10th Cir.1989), *cert. denied,* 498 U.S. 937, 111 S.Ct. 340, 112 L.Ed.2d 305 (1990), citing *Gingles,* 478 U.S. at 50, 106 S.Ct. at 2766. Failure to establish any one of the *Gingles* factors precludes a § 2 violation. *Growe,* —— U.S. at ——, 113 S.Ct. at 1084; *Lee,* 994 F.2d at 1146, citing *Gingles,* 478 U.S. at 50, 106 S.Ct. at 2766.

■ Because Congress intended the ultimate conclusions about equality or inequality of political opportunity to rest on "comprehensive, not limited, canvassing of relevant facts," the three *Gingles* preconditions may not be isolated as sufficient, standing alone, to prove vote dilution. *DeGrandy,* —— U.S. at ——, 114 S.Ct. at 2657. Once the minority group satisfies the *Gingles* threshold inquiry, it must then offer evidence of the totality of circumstances demonstrating that the minority group has "less opportunity than other members of the electorate to participate in the political process and elect representatives of their choice." *Lee,* 994 F.2d at 1146, citing 42 U.S.C. § 1973(b).

■ The Senate Report accompanying the 1982 amendments to § 2 listed several factors that may be relevant to the totality of circumstances inquiry in a § 2 claim:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction;

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

*Sanchez,* 875 F.2d at 1491–92, citing S.Rep. No. 417, 97th Cong., 2d Sess. 28–29 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 206–07. In applying these factors, the court should keep certain additional considerations in mind: (1) that the list is exemplary, not exclusive—the court may consider any relevant factors in reaching its conclusion; (2) that there is no requirement that any particular number of factors be proved or that a majority of them point one way or the other; and (3) that whether the political processes are equally open depends upon a searching practical evaluation of the past and present reality and upon a functional view of the political process. *Sanchez,* 875 F.2d at 1492, citing *Gingles,* 478 U.S. at 46, 106 S.Ct. at 2764. Loss of political power through vote dilution is distinct from the mere ability to win a particular election. *Whitcomb v. Chavis,* 403 U.S. 124, 153, 91 S.Ct. 1858, 1873, 29 L.Ed.2d 363 (1971). Ultimately, a district court can find a § 2 violation only if, "in the particular situation, the [challenged] practice operate[s] to deny the minority plaintiff[s] an equal opportunity to participate [in the political process] and to elect candidates of their choice." *Lee,* 994 F.2d at 1147, citing S.Rep. No. 417, 97th Cong., 2d Sess. at 30; 1982 U.S.C.C.A.N. at 207.

The court must be careful not to overemphasize the relative importance of the three *Gingles* factors and of historical discrimination, when measured against evidence tending to show that in spite of these facts, minority voters have an equal measure of political and electoral opportunity. *DeGrandy,* —— U.S. at ——, 114 S.Ct. at 2658. A conclusion of lack of equal electoral opportunity "must still be addressed explicitly, without isolating any other arguably relevant facts from the act of judgment." *DeGrandy,* —— U.S. at ——, 114 S.Ct. at 2657. The probative significance of the *Gingles* factors must be critically assessed after considering further circumstances with arguable bearing on the issue of equal political opportunity. *DeGrandy,* —— U.S. at ——, 114 S.Ct. at 2658. Proof of the three *Gingles* factors is not enough "if other considerations show that the minority has an undiminished right to participate in the political process." *DeGrandy,* —— U.S. at —— n. 10, 114 S.Ct. at 2657 n. 10, quoting *Baird v. Consolidated City of Indianapolis,* 976 F.2d 357, 359 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2334, 124 L.Ed.2d 246 (1993) ("other considerations" included the fact that while the four at-large City–County Council seats tended to go to Republicans, one of the Republicans elected was black). "As facts beyond the ambit of the three *Gingles* factors loom correspondingly larger, factfinders cannot rest uncritically on assumptions about the force of the *Gingles* factors in pointing to dilution." *DeGrandy,* —— U.S. at ——, 114 S.Ct. at 2658.

### C. *Analysis*

1. The First *Gingles* Factor: Geographical Compactness of Minority Group

■ First, the burden of proving the *Gingles* preconditions rests "squarely on the plaintiff's shoulders." *Marylanders for Fair Representation, Inc. v. Schaefer,* 849 F.Supp. 1022, 1045 (D.Md.1994), quoting *Voinovich,* —— U.S. at ——, 113 S.Ct. at 1156. Second, the compactness requirement is not a trivial concept. Where a minority group is not large enough, geographically concentrated enough, or politically cohesive enough to constitute a voting majority in a single member district, a claim for vote dilution fails. *Gingles,* 478 U.S. at 90, 106 S.Ct. at 2787 (O'Connor, J., concurring). A showing of geographical compactness is a threshold matter because, unless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by the structure or practice. *Garza v. County of Los Angeles,* 756 F.Supp. 1298, 1344 (C.D.Cal.1990), citing *Gingles,* 478 U.S. at 50 n. 17, 106 S.Ct. at 2766 n. 17 (emphasis in original).

The Plaintiffs say they have shown that "it is possible to draw a majority-Hispanic House district which unites significant Hispanic population concentrations in the San Luis Valley and Pueblo and Las Animas counties." (Plaintiffs' Post–Trial Memorandum p. 51). Plaintiffs' statistical expert, Dr. Bardwell, developed three alternative State House districts with Hispanic voting age populations of 50.03%, 51.6%, and 54.8%. The Plaintiffs concentrated on the proposed 50.03% alternative H.D. 60. The first *Gingles* precondition requires the court to determine whether the Hispanic population within the Plaintiffs' proposed alternative H.D. 60 is sufficiently large and geographically compact to constitute a majority in that district.

■ While the Plaintiffs are not required to provide a final redistricting plan for remedial purposes, the burden is on the Plaintiffs to prove that Hispanics are sufficiently numerous and geographically compact to constitute a majority in an alternative district. It is appropriate to consider the size and geographic compactness of the minority group within a reasonable alternative district as a benchmark against which to measure the existing district that is being challenged as dilutive. *See Holder v. Hall,* —— U.S. ——, ————, 114 S.Ct. 2581, 2585–86, 129 L.Ed.2d 687 (1994).

■ Several principles guide the court in its comparison of the proposed alternative H.D. 60 and the challenged present H.D. 60. First, courts should be reluctant to order the creation of districts of "bizarre" or "dramatically irregular" shape. *Marylanders,* 849 F.Supp. at 1053, quoting *Shaw v. Reno,* ——

U.S. ——, ——, ——, ——, 113 S.Ct. 2816, 2820, 2825, 2831, 125 L.Ed.2d 511 (1993). Courts should pay attention to both geometric and substantive criteria when testing for compactness under *Gingles*. *Marylanders*, 849 F.Supp. at 1053. The Plaintiffs need not establish that the minority population is compact in an absolute or aesthetic sense; they need only establish that it is "sufficiently . . . compact" to show that a majority Hispanic district is feasible. *Gingles*, 478 U.S. at 50, 106 S.Ct. at 2766.

Second, although a state can, and at times must, place great weight on race when redistricting, it may not do so to the exclusion of all traditional, nonracial districting principles, leaving a district that rationally can be understood only as "an effort to classify and separate voters by race." *Marylanders*, 849 F.Supp. at 1053, quoting *Shaw*, —— U.S. at ——, 113 S.Ct. at 2828. Although no Fourteenth or Fifteenth Amendment claims are now before the court, it is necessary to bear in mind that redistricting must comply with the overriding demands of the Equal Protection Clause. *DeGrandy*, —— U.S. at ——–——, 114 S.Ct. at 2666–67 (Kennedy, J., concurring). " '[A] reapportionment scheme so irrational on its face that it can be understood only as an effort to segregate voters into separate voting districts because of their race' must be subject to strict scrutiny under the Equal Protection Clause." *Id.* —— U.S. at ——, 114 S.Ct. at 2667, quoting *Shaw*, —— U.S. at ——, 113 S.Ct. at 2832. "Racial classifications 'are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality,' and are presumed invalid." *Id.* —— U.S. at ——, 114 S.Ct. at 2666, quoting *Shaw*, —— U.S. at ——, ——, 113 S.Ct. at 2816, 2818. "This is true regardless of 'the race of those burdened or benefited by a particular classification.' " *Id.*, —— U.S. at ——, 114 S.Ct. at

2666, quoting *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 494, 109 S.Ct. 706, 722, 102 L.Ed.2d 854 (1989). "Racial gerrymandering, even for remedial purposes, may balkanize us into competing racial factions; it threatens to carry us further from the goal of a political system in which race no longer matters—a goal that the Fourteenth and Fifteenth Amendments embody, and to which the Nation continues to aspire." *Id.* —— U.S. at ——, 114 S.Ct. at 2666, quoting *Shaw*, —— U.S. at ——, 113 S.Ct. at 2832. "A reapportionment plan that includes in one district individuals who belong to the same race, but who are otherwise widely separated by geographical and political boundaries, and who may have little in common with one another but the color of their skin, bears an uncomfortable resemblance to political apartheid." *Shaw v. Reno*, —— U.S. ——, ——, 113 S.Ct. 2816, 2827, 125 L.Ed.2d 511 (1993).

The court is also guided by the Supremacy Clause, U.S. Const. art. VI, cl. 2, and the Colorado Constitution, art. V, §§ 46–47. Colorado's 1992 reapportionment plan (including H.D. 60) was required to be consistent with six parameters in order of importance: (1) the Fourteenth Amendment Equal Protection Clause and the Fifteenth Amendment; (2) § 2 of the Voting Rights Act; (3) the Colo. Const. art. V, § 46, requiring equality of population in each house district; (4) the Colo. Const. art. V, § 47(2), requiring that districts not cross county lines except to meet § 46 requirements and requiring that the number of cities and towns contained in more than one district be minimized; (5) the Colo. Const. art. V, § 47(1), requiring each district to be as compact as possible and to consist of contiguous whole general election precincts; and (6) the Colo. Const. art. V, § 47(3), requiring preservation of communities of interest within a district.[1] *In re Colorado General Assembly*, 828 P.2d at 190.

---

1. Colo. Const. art. V, § 46 provides:
    **Senatorial and representative districts.** The state shall be divided into as many senatorial and representative districts as there are members of the senate and house of representatives respectively, each district in each house having a population as nearly equal as may be, as required by the constitution of the United States, but in no event shall there be more than five percent deviation between the most populous and the least populous district in each house.

Colo. Const. art. V, § 47 provides:
    (1) Each district shall be as compact in area as possible and the aggregate linear distance of all district boundaries shall be as short as possible. Each district shall consist of contiguous whole general election precincts. Districts of the same house shall not overlap.

    (2) Except when necessary to meet the equal population requirements of section 46, no part of one county shall be added to all or part of

*a. Is the Hispanic population sufficiently large and geographically compact to constitute a majority in the Plaintiffs' proposed H.D. 60?*

The Valley is geographically unique. It is surrounded by the Sangre de Cristo mountains to the east, the La Garita mountains and Cochetopa Hills to the north, and the San Juan mountains to the west. Access to the Valley is primarily by way of La Veta Pass on U.S. Highway 160 to the east, Wolf Creek Pass on U.S. Highway 160 to the west, Poncha Pass on U.S. Highway 285 to the north, and San Antonio Mountain on U.S. Highway 285 to the south. At 8,194 square miles, the Valley is the largest intermountain valley in the world. Alamosa is the largest city with a 1992 population of 7,892 and Monta Vista the second largest with 4,621. Alamosa is the recognized growth center and has the most retail trade and services activity, while Monte Vista is the agribusiness center. Alamosa is the banking, education, and health care hub of the Valley. (Testimony of Juan Gomez, Defendants' Exhibits V, W, Y, and 2K).

Approximately 58% of the Valley's floor is used as rangeland, 25% as cropland, and 11% as pastureland. Approximately 57.4% of the Valley is managed by the federal government, 3.9% is State land, and 38.5% is privately owned. Federal presence is greatest in Mineral and Saguache counties and private ownership is greatest in Costilla and Alamosa counties. The Valley's agricultural economy is dependent upon irrigation, leaving the Valley with unique water needs. Surface water supply comes from snowmelt into the Rio Grande and Conejos Rivers. Another major source of water is the extensive underground aquifer system underlying the Valley floor. (Defendants' Exhibits 2I and 2K).

Agriculture and agribusiness are the Valley's major export industries and comprise approximately 27.3% of the Valley's economy. The Valley is the nation's fifth largest potato growing region. In 1991, Valley potato production represented 92.1% of Colorado's potato crop. Most labor in the Valley is used for agricultural production and packing operations. (Defendants' Exhibit 2K).

The Valley was settled on Mexican land grants by Hispanos, Spanish-speaking people from New Mexico who considered themselves to be of Spanish, not Mexican, descent. Pueblo was not part of the "Hispano Homeland" and was settled after the Valley. (Plaintiffs' Exhibits 64, 103). Hispanics in the Valley share a common Spanish colonial cultural and religious heritage which continues to value the extended family. While the majority of Hispanics in the Valley are Catholic, many Hispanics are affiliated with various protestant churches. Catholic parishes and parishioners maintain their independence from the Pueblo Diocese of which they are members. (Defendants' Exhibit V).

Pueblo is located on I–25, approximately 120 miles from Alamosa. Most of the communities in the Valley do not receive radio and television communications from Pueblo. Pueblo is a long distance telephone call from the Valley. Pueblo and the Valley each have their own colleges. In 1990, Pueblo was the fifth largest city in Colorado, with a population of 98,640. The age composition of Pueblo has undergone significant change, resulting in an increased proportion of the elderly population. Approximately 40% of Pueblo's population is Hispanic, but the distribution is not uniform or homogeneous. Pueblo has experienced an increasing crime rate and Pueblo constituents are concerned with issues of crime and gangs. (Defendants' Exhibits V and 2M).

another county in forming districts. Within counties whose territory is contained in more than one district of the same house, the number of cities and towns whose territory is contained in more than one district of the same house shall be as small as possible. When county, city, or town boundaries are changed, adjustments, if any, in legislative districts shall be as prescribed by law.

(3) Consistent with the provisions of this section and section 46 of this article, communities of interest, including ethnic, cultural, economic, trade area, geographic, and demographic factors, shall be preserved within a single district wherever possible.

Hispanos who later settled in Pueblo moved from a rural, agricultural lifestyle to an urban, wage and labor lifestyle. The Valley remains a primarily agriculturally-based economy, while Pueblo retains an industrially-based economy. In 1990, approximately 70% of the Valley's population was classified as rural. Only about 1.1% of Pueblo's economy is based on agriculture. As reflected by the 1990 Census, the socioeconomic status of Hispanics in the Valley is generally lower than that of Hispanics living in Pueblo and Trinidad. Pueblo has endured significant erosion of its industrial base, but has become successful in attracting new, cleaner, light industry and creating new economic development. (Testimony of Representative Romero; Defendants' Exhibits V, W, and Y).

Judged by the principles of contiguity, preservation of communities of interest, and minimizing the splitting of counties and municipalities, the proposed alternative H.D. 60 is not compact. First, the Plaintiffs' proposed alternative H.D. 60 does not score well on mathematical tests for compactness. (*See* Defendants' Exhibits 2C, 2E pp. 6–7 for explanation of mathematical test methods). H.D. 60 has the largest total perimeter of any current Colorado House district. It scores the lowest on the Schwartzburg test of any district in Colorado, with a score of 3.3736, significantly below the next lowest score in the State. It scores fourth lowest in the State on the Reock test, with a score of 25.47. Judged by mathematical tests for compactness, the proposed alternative H.D. 60 is not compact. (*See* Defendants' Exhibits 2E pp. 6–7, 2F, 2G).

Second, the current H.D. 60 splits only one county and no municipalities. The Plaintiffs' alternative H.D. 60 splits all seven counties in its proposed district (Saguache, Alamosa, Conejos, Costilla, Rio Grande, Las Animas, and Pueblo), three cities (Alamosa, Trinidad, and Pueblo), and some Pueblo precincts. (Defendants' Exhibits 2R, 2U, 2Y, and 2Z). Plaintiff's proposed alternative H.D. 60 cuts across county lines, municipal boundaries, precinct boundaries, political boundaries, and communities.

Third, "communities of interest" represent distinctive units that share common concerns with respect to one or more identifiable features such as geography, demography, ethnicity, culture, socioeconomic status, or trade. *Carstens v. Lamm,* 543 F.Supp. 68, 91 (D.Colo.1982). The Valley is home to the San Luis Valley County Commissioners Association, Peace Officers' Association, and Bar Association. The Valley comprises a single judicial district, has a centralized law enforcement system, and Valley residents almost unanimously opposed the AWDI water development project. The Plaintiffs' proposed H.D. 60 splits the Valley, an identifiable community of interest.

Fourth, the Plaintiffs' proposed H.D. 60 is not contiguous. A district qualifies as contiguous if every part of the district is reachable from every other part without crossing the district boundary, *i.e.,* the district is not divided into two or more discrete pieces. Grofman, Bernard, *Criteria for Districting,* 33 UCLA L.Rev. 77, 84 (1985). A resident of the proposed H.D. 60 would be required to travel outside the district to get from the Valley to Pueblo.

Fifth, the proposed H.D. 60 would erode the number of political offices held by Hispanics in the Valley and in the adjacent districts. The districts of Representatives Salaz and Romero would necessarily contain fewer Hispanic voters. Representatives Salaz and Romero presently receive substantial political support from Hispanics. Sheriff Medina would be precluded from running for reelection for his current office as Sheriff of Rio Grande County because his residence is not in the proposed alternative H.D. 60.

Sixth, the Plaintiffs' proposed H.D. 60 would impede effective political representation. (Testimony of Representative Romero, Representative Salaz, Representative Entz, Sheriff Medina, and Selso Lopez). House Representatives Romero, Salaz, and Entz expressed concern about: (1) the difficulty of meeting with constituents in such a large, geographically dispersed district, (2) the possibility that the Valley could be represented by someone not from the Valley and Pueblo could be represented by someone not from Pueblo, and (3) the risk that Hispanic repre-

sentation could be significantly reduced in the adjacent House districts (H.D. 47 has had a Hispanic representative for more than ten years; Representative Romero has represented H.D. 46 for 5 terms (*see* Plaintiffs' Exhibit 8)). The current Representatives expressed concern that Pueblo's more urbanized interests could actually be at odds with the Valley's more agricultural interests.

■ Based on all of the above considerations, the court concludes that the Plaintiffs cannot meet their burden of proving the first *Gingles* precondition to a § 2 challenge: that the minority group is sufficiently large and compact such that a majority Hispanic district is feasible. The Plaintiffs' proposed H.D. 60 would split the Valley, diluting the political power of the Valley as a whole and Hispanics' political power within the Valley. The Plaintiffs' proposed H.D. 60 would pit the political interests of Pueblo residents against the political interests of Valley residents. Hispanics in the Plaintiffs' proposed alternative H.D. 60 do not all have the same economic, political, and social interests. The proposed alternative H.D. 60 would impede effective representation for all Hispanics in South Central Colorado.

Because the Plaintiffs have not established the first of the three "necessary preconditions" from *Gingles*, the court need go no further in its analysis. *See DeGrandy*, —— U.S. at ——, 114 S.Ct. at 2657, quoting *Gingles*, 478 U.S. at 50, 106 S.Ct. at 2766; *Sanchez*, 875 F.2d at 1492, citing *Gingles*, 478 U.S. at 50, 106 S.Ct. at 2766. In the absence of a showing that the minority group is sufficiently large and geographically compact to constitute a majority in a single member district, the minority voters' inability to elect their preferred candidate cannot constitute a violation of § 2. *DeGrandy*, —— U.S. at ——, 114 S.Ct. at 2657; *Growe*, 507 U.S. at ——, 113 S.Ct. at 1084; *Lee*, 994 F.2d at 1146, citing *Gingles*, 478 U.S. at 50, 106 S.Ct. at 2766. However, in the interests of judicial economy, the court will address the second and third *Gingles* preconditions and the totality of the circumstances inquiry.

## 2. The Second and Third *Gingles* Factors: Political Cohesiveness of Minority Group and Racial Bloc Voting

■ The purpose of inquiring into the existence of racially polarized voting is twofold: (1) to ascertain whether minority group members constitute a politically cohesive unit, and (2) to determine whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates. *Gingles*, 478 U.S. at 56, 106 S.Ct. at 2769 (citation omitted). Thus, the question whether a given district experiences legally significant racially polarized voting requires discrete inquiries into minority and white voting practices. *Gingles*, 478 U.S. at 56, 106 S.Ct. at 2769. The Supreme Court has unanimously reaffirmed that minority-group political cohesion and racial bloc voting never can be assumed, but specifically must be proved in each case in order to establish that a redistricting plan dilutes minority voting strength in violation of § 2. *Shaw*, —— U.S. at ——, 113 S.Ct. at 2830, citing *Growe*, 507 U.S. ——, ——, 113 S.Ct. 1075, 1076, 122 L.Ed.2d 388 (1993); *Sanchez*, 875 F.2d at 1492, citing *Gingles*, 478 U.S. at 45–46, 106 S.Ct. at 2763–2764.

■ Racially polarized voting exists when there is a consistent relationship between the race of the voter and the way in which the voter votes or, in other words, where minority voters and white voters vote differently. *Sanchez*, 875 F.2d at 1493, citing *Gingles*, 478 U.S. at 53 n. 21, 62–63, 106 S.Ct. at 2768 n. 21, 2772–2773. The race of the candidate *per se* is irrelevant to a racial bloc voting analysis. Under § 2, it is the *status* of the candidate as the *chosen representative of a particular racial group*, not the race of the candidate, that is important. *Gingles*, 478 U.S. at 67–68, 106 S.Ct. at 2774–2775 (emphasis in original). Nothing in § 2 indicates that the chosen representative of a minority group must be a minority. *Sanchez*, 875 F.2d at 1495. The Plaintiffs must prove on an election-by-election basis, by a preponderance of the evidence, which candidates are minority-preferred. *Jenkins v. Red Clay Consolidated School District Board of Education*, 4 F.3d 1103, 1126 (3d Cir.1993), *cert. denied*, —— U.S. ——, 114

S.Ct. 2779, 129 L.Ed.2d 891 (1994) (citation omitted).

Legally significant white bloc voting occurs where, in the absence of special circumstances, the white bloc vote normally will defeat the combined strength of minority votes plus white "crossover" votes. *Gingles,* 478 U.S. at 51, 106 S.Ct. at 2766; *Sanchez,* 875 F.2d at 1492, citing *Gingles,* 478 U.S. at 50–51, 106 S.Ct. at 2766–2767. The degree of racial bloc voting that is cognizable as an element of a § 2 vote dilution claim will vary according to a variety of factual circumstances, so there is no simple doctrinal test for the existence of legally significant racial bloc voting. The amount of white bloc voting that can generally "minimize or cancel" minority voters' ability to elect representatives of their choice will vary from district to district according to a number of factors, including: (1) the nature of the allegedly dilutive electoral mechanism; (2) the presence or absence of other potentially dilutive electoral devices, such as majority vote requirements, designated posts, and prohibitions against bullet voting; (3) the percentage of registered voters in the district who are members of the minority group; and (4) the size of the district. *Gingles,* 478 U.S. at 56, 106 S.Ct. at 2769.

The Plaintiffs argue that, in determining whether in fact the minority group votes cohesively, court may not consider the reasons why minority voters may vote alike, citing *Sanchez,* 875 F.2d at 1493. The Plaintiffs asserted repeatedly at trial that the court may not consider any factors other than the race of the voter and the selection of certain candidates in determining whether racially polarized voting exists. However, the court believes it is permitted to undertake the additional inquiry into the reasons for, or causes of, voting behavior. *See De-Grandy,* — U.S. at ——, 114 S.Ct. at 2657; *League of Latin American Citizens v. Clements (LULAC),* 999 F.2d 831, 853–54 (5th Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 878, 127 L.Ed.2d 74 (1994). The Court in *DeGrandy* directs that lack of equal electoral opportunity under § 2 must "be addressed explicitly, without isolating any other arguably relevant facts from the act of judg-

ment." — U.S. at ——, 114 S.Ct. at 2657. "The ultimate conclusions about equality or inequality of opportunity were intended by Congress to be judgments resting on comprehensive, not limited, canvassing of relevant facts." *DeGrandy,* — U.S. at ——, 114 S.Ct. at 2657. *DeGrandy* requires consideration of "comprehensive, not limited facts" that are "arguably relevant." — U.S. at ——, 114 S.Ct. at 2657. Under the reasoning of *DeGrandy,* this court believes it is permitted to examine any "arguably relevant" reasons for voting behavior. — U.S. at ——, 114 S.Ct. at 2657. Accordingly, without "explaining away" racial bloc voting with any one reason for voting behavior, *see Sanchez,* 875 F.2d at 1493, the court will not restrict its examination to Dr. Bardwell's bivariate analysis, but will also consider Dr. Zax's multivariate analysis. *See (LULAC),* 999 F.2d at 853–54.

Both the statistical evidence (Defendants' Exhibits S, T, and 2Q) and the lay witness testimony established that many factors influence voting behavior and electoral success in H.D. 60. Although the Plaintiffs assert that their only real candidate of choice must be a Hispanic Democrat, witnesses for both the Plaintiffs and the Defendants acknowledged that many different considerations influence their votes. There is substantial evidence that the following factors have influenced voting patterns in H.D. 60: (1) party affiliation of the candidate; (2) incumbency of the candidate; (3) the candidate's track record, if any, in political office; (4) the candidate's platform; (5) the candidate's name recognition in the Valley; (6) campaign strategy; (7) campaign finances; (8) effort put into campaigning and time spent campaigning door-to-door; (9) personal characteristics of the candidate, including qualifications, reputation, speaking ability, residence, family ties, gender, personal popularity, ethnicity, and visibility in the community; (10) identification of the candidate with past political scandals; and (11) the voter's ethnicity.

The evidence demonstrated that while Hispanics in H.D. 60 vote cohesively on some issues of particular universal interest, Hispanics vote differently on other issues and candidates. Approximately 20% of Hispanics

in H.D. 60 are registered as Republicans and 80% as Democrats. Approximately 56% of Anglos in H.D. 60 are registered as Republicans and 44% are registered as Democrats. Approximately 16% of the voters in H.D. 60 are registered Independent. Numerous Hispanic Valley residents and voters testified that their political interests are not the same as the political interests of the Plaintiffs. Hispanics in the Valley cannot be classified as one distinct political group with the same political interests.

■ The Colorado Reapportionment Commission relied on data that approximately 20% of Anglo voters in the Valley "cross over" to vote for the Hispanic candidate-of-choice. Dr. Bardwell estimated a white crossover vote of 13%–17%. Based on the Anglo crossover vote and all the evidence, statistical and anecdotal, the court concludes that the Plaintiffs have not proven that a legally significant white bloc vote normally defeats the combined strength of minority votes plus white "crossover" votes.

The court found other significant problems, flaws, and deficiencies in the Plaintiffs' statistical conclusions regarding Hispanic political cohesiveness and white bloc voting. But, the court need not explore those concerns in depth at this time. Under *DeGrandy*, even if the court assumes that the Plaintiffs have proved each and every one of the three *Gingles* preconditions, the court must go on to make a "totality of circumstances" determination. —— U.S. at ——–——, 114 S.Ct. at 2656–58.

3. The Totality of Circumstances Inquiry

■ ■ Throughout the trial, the Plaintiffs argued that it is almost impossible to lose a § 2 challenge on the totality of circumstances inquiry when the three *Gingles* preconditions have been met. The Supreme Court has stated otherwise in *DeGrandy*, —— U.S. at ——–——, 114 S.Ct. at 2656–58. *Gingles* "clearly declined" to hold the three preconditions sufficient in combination to prove a § 2 claim, "either in the sense that a court's examination of relevant circumstances was complete once the three factors were found to exist, or in the sense that the three in combination necessarily and in all circum-

stances demonstrated dilution." *DeGrandy*, —— U.S. at ——, 114 S.Ct. at 2657. Accordingly, the court must proceed to the "totality of circumstances" inquiry.

■ Again, the Senate Report list of nine factors to consider is not exclusive—the court may consider any relevant factors in reaching its conclusion and no particular number of factors need be proved. *Sanchez*, 875 F.2d at 1492, citing *Gingles*, 478 U.S. at 46, 106 S.Ct. at 2764. Whether the political processes are equally open depends upon a searching practical evaluation of the past and present reality and upon a functional view of the political process. *Sanchez*, 875 F.2d at 1492, citing *Gingles*, 478 U.S. at 46, 106 S.Ct. at 2764. A § 2 violation may be found only if the challenged practice operates to deny the minority plaintiffs an equal opportunity to participate in the political process and to elect candidates of their choice. *Lee*, 994 F.2d at 1147 (citation omitted).

*a. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, vote, or otherwise to participate in the democratic process;*

The evidence revealed that Hispanics in South Central Colorado, like many other ethnic groups in the United States, have experienced certain social, economic, and political effects of discrimination. The only evidence of "official" discrimination, however, involved activity by the Clerk and Recorder of Saguache County approximately eighteen years ago. The State properly pursued an investigation into his alleged activities and the situation was ultimately corrected. While the Plaintiffs perceived the English Only Amendment in 1988 to be based on discriminatory motives, the Amendment was soundly defeated by a solid coalition of Hispanic and Anglo voters. The only recent allegation of "official" discrimination involved the loss of some Hispanic voter registrations in approximately 1986. (Testimony of Jennie Sanchez).

*b. the extent to which voting in the elections of the state or political subdivision is racially polarized;*

When the Plaintiffs' allegations of racially polarized voting are evaluated by the multi-

variate analysis, the evidence reveals that, while ethnicity plays a role in voting behavior, it is only one of many other factors that contribute to voting behavior. Taking into account the problems with Dr. Bardwell's bivariate analysis (overly restrictive bivariate analysis, statistical bias, use of 1990 census data, type of races analyzed too narrowly defined, use of absentee ballots, underestimated impact of white crossover votes, failure to consider impact on adjacent districts, and the occurrence of impossible estimates, among others), the court is not convinced that the evidence specifically proves legally significant racially polarized voting in H.D. 60. (*See* part C. 2. of this Memorandum Opinion and Order).

*c. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;*

The parties did not introduce any evidence as to this factor.

*d. if there is a candidate slating process, whether the members of the minority have been denied access to that process;*

The parties did not introduce any evidence as to this factor.

*e. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment, and health, which hinder their ability to participate effectively in the political process;*

According to the 1990 Census data, Anglos in the Valley have higher education and income levels than Hispanics, as well as lower unemployment and poverty rates than Hispanics. In the ten years between the 1980 Census and the 1990 Census, unemployment and poverty rates for Hispanics have remained stable, while unemployment and poverty rates for Anglos have increased. According to estimates, Hispanics in H.D. 60 turn out to vote at rates only slightly less (1%) than non-Hispanics. (Testimony of Dr. Bardwell). Hispanic voter registration is virtually equal to Anglo voter registration.

Hispanic voter turnout in H.D. 60 is substantial; equivalent to Anglo voter turnout rates statewide and twice as high as Hispanic voter turnout rates statewide.

Many Hispanic long-time residents of the Valley testified at the trial that H.D. 60 does not dilute Hispanic voting power. They testified that, while racial discrimination was more prevalent in the Valley in the past, today Hispanics have equal access to education, jobs, and loans. Hispanics are teachers, business owners, elected officials, and party officials. The Plaintiffs themselves have been successful in establishing convenient voter registration hours and in substantially increasing Hispanic voter registration and turnout. Even assuming that Hispanics in the Valley have borne the effects of past socioeconomic disparities, the evidence demonstrates that any past discrimination does not significantly impede Hispanics' ability today to participate effectively in the political process in H.D. 60.

*f. whether political campaigns have been characterized by overt or subtle racial appeals;*

Plaintiffs rely on evidence of a few comments made in the past by private individuals. Some of these allegedly discriminatory comments were hearsay, some were made anonymously, and some were so remote in time as to carry little weight. The Plaintiffs also rely on the publication of a list of absentee voters by a local newspaper as the most recent overt racial appeal against Hispanic voters. As the identity of absentee voters is a matter of public record, this incident carries little weight.

*g. the extent to which members of the minority group have been elected to public office in the jurisdiction;*

The evidence indicated that Hispanics experience no serious impediments to participating in the political process today. Hispanics in H.D. 60 actively participate in the Democratic and Republican parties. Hispanics control the Democratic party in the Valley. Hispanics have run for and been elected to numerous political offices in the Valley. Hispanics are elected and appointed to local, county, and state-level boards, commissions,

and offices. The evidence shows that Hispanics have served and continue to serve on local school boards, in local mayoral offices, on rural electric boards, on boards of county commissioners, in sheriff's offices, and in other county offices.

Hispanics in H.D. 60 are active participants in both the Republican and Democratic parties. Hispanics have been delegates to Republican and Democratic state and national conventions. One of the Plaintiffs has held political office in the Valley and two of the Plaintiffs have held office in the Democratic party. The Plaintiffs have conducted successful campaigns to improve Hispanic voter registration, Hispanic voter turnout, and Hispanic absentee voting. While the Plaintiffs' Hispanic Democratic candidates of choice have not yet won the H.D. 60 representative seat, the Plaintiffs' Hispanic Democratic candidates of choice have consistently been nominated by the Democratic party and won the Democratic primaries. (Testimony of Jennie Sanchez).

h. *Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group;*

While the Plaintiffs point to evidence that several local public officials in H.D. 60 have been non-responsive to particularized Hispanic needs, the court believes that evidence of the responsiveness of H.D. 60's state legislator is the most probative. The Plaintiffs' primary criticisms of Representative Entz are that he did not speak out strongly enough against the English Only Amendment, he did not speak out strongly enough in favor of bilingual education for non-English speaking children, and he does not attempt to meet and talk with Democrats in Center. (Testimony of Jennie Sanchez). The evidence indicates, however, that Representative Entz has been responsive to the needs of all his constituents, including Hispanics. Representative Entz has worked on education issues, housing issues, and economic development issues. He worked against the English Only Amendment, has worked to obtain funding through grants for local governments within H.D. 60 (Defendants' Exhibit B), has worked on a 1994 school financing act to obtain equality in school financing, and has helped constituents obtain jobs. Representative Entz has supported Hispanic candidates for office, has worked on a Scenic Byway designation, has supported the Cumbres & Toltec Railroad enterprise, and has worked in cooperation with the Hispanic representatives in the Legislature. Entz sees the most important issues for H.D. 60 as economic development, education, and water. He has worked continuously to attract agriculturally based entities to H.D. 60.

i. *Whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous;*

There is no evidence that the State's asserted reasons for drawing and defending H.D. 60 are maintained on a tenuous basis as a pretext for discrimination. The evidence shows that the Colorado Reapportionment Commission followed the dictates of § 2 in drawing H.D. 60 from the beginning to the end of the reapportionment process. H.D. 60 as currently drawn actually increased the Hispanic voting age population by more than 5% over the previous district. After numerous meetings and public hearings, where sentiment was overwhelming to keep the Valley politically whole and intact, the Commission adopted H.D. 60 as currently drawn and the Colorado Supreme Court approved it over objections similar to those brought by the Plaintiffs here. Reapportionment is certainly always a delicate balancing act between the Voting Rights Act and many other considerations. It cannot properly be said that the State's reasons for drawing H.D. 60 were tenuous.

D. *Conclusion*

Under the Plaintiffs' theory of this case, "votes that do not control a representative are essentially wasted; those who cast them go unrepresented and are just as surely disenfranchised as if they had been barred from registering.... Such conclusions, of course, depend upon a certain theory of the 'effective' vote, a theory that is not inherent in the concept of representative democracy itself." *Holder,* —— U.S. at ——, 114 S.Ct. at 2595

(Thomas, J., concurring in the judgment). The Plaintiffs' position gives "credence to the view that race defines political interest." *Id.* —— U.S. at ——, 114 S.Ct. at 2597. The Plaintiffs position leads us "towards a system that is indistinguishable in principle from a scheme under which members of different racial groups are divided into separate electoral registers and allocated a proportion of political power on the basis of race." *Id.* —— U.S. at ——, 114 S.Ct. at 2598. The Plaintiffs would have the court assume "that members of the racial group must think alike and that their interests are so distinct that the group must be provided a separate body of representatives in the legislature to voice its unique point of view. Such a 'system, by whatever name it is called, is a divisive force in a community, emphasizing differences between candidates and voters that are irrelevant.'" *Id.* —— U.S. at ——, 114 S.Ct. at 2599, citing *Wright v. Rockefeller*, 376 U.S. 52, 67, 84 S.Ct. 603, 611, 11 L.Ed.2d 512 (1964). Such a system generates "antagonisms that relate to race or religion rather than to political issues ...; communities seek not the best representative, but the racial or religious partisan." *Id.* —— U.S. at ——, 114 S.Ct. at 2599, citing *Wright*, 376 U.S. at 67, 84 S.Ct. at 611. As a practical political matter, the Plaintiffs' urging "to segregate political districts by race can only serve to deepen racial divisions by destroying any need for voters or candidates to build bridges between racial groups or to form voting coalitions." *Id.* —— U.S. at ——, 114 S.Ct. at 2599. The Plaintiffs' theory of the case reflects, as Justice Thomas more ably describes:

> "only one possible understanding of effective exercise of the franchise, an understanding based on the view that voters are 'represented' only when they choose a delegate who will mirror their views in the legislative halls.... But it is certainly possible to construct a theory of effective political participation that would accord greater importance to voters' ability to influence, rather than control, elections. And especially in a two-party system such as ours, the influence of a potential 'swing' group of voters composing 10%–20% of the electorate in a given district can be considerable.... Some conceptions of representative government may primarily emphasize the formal value of the vote as a mechanism for participation in the electoral process, whether it results in control of a seat or not.... Under such a theory, minorities unable to control elected posts would not be considered essentially without a vote; rather, a vote duly cast and counted would be deemed just as 'effective' as any other. If a minority group is unable to control seats, that result may plausibly be attributed to the inescapable fact that, in a majoritarian system, numerical minorities lose elections."

*Id.* —— U.S. at ——–——, 114 S.Ct. at 2595–96.

Treating equal political opportunity as the focus of the inquiry and examining the three *Gingles* preconditions and the totality of the circumstances, the court concludes that H.D. 60 as presently drawn does not deny Hispanic voters equal political opportunity under the meaning of § 2 of the Voting Rights Act.

Accordingly,

IT IS ORDERED that judgment is entered in favor of the Defendants and against the Plaintiffs on the complaint alleging violation of § 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973.